Filed 1/17/14  In re S.D. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.D., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br> v. <br> R.B., <br><br> Defendant and Appellant. | A137169 <br><br> (San Mateo County Super. Ct. No. 79857) |

R.B. (mother) appeals from a jurisdictional order removing her youngest child (S.D.) from her custody.  Mother frames the issue as follows: "Can a parent's failure to acknowledge sibling [sexual] abuse [by the stepfather (her husband)] establish that a child cannot safely remain in that parent's custody, even if the parent is willing to follow orders preventing the abuser from contacting the child?"  As we will discuss, the record reflects a much more complex situation than mother's question suggests, and given the entirety of the record before the dependency court, we conclude ample evidence supports the removal order.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Mother and S.D.'s father, R.D., were married in India in 2003. Mother then moved to the United States, where S.D. was born in August 2004.  R.D. joined mother and S.D.

in the United States the following year. Mother has two additional children from a prior marriage, a daughter, R.J., and a son, S.J. These children joined the family in the United States in 2006.

*The Initial Dependency Petition (September 2009)*

On September 8, 2009, R.J., who was then 15 years old, met with a social worker and disclosed R.D. had been sexually abusing her since she was 11 years old. R.J. then participated in a pretext phone call, wherein R.D. did not deny touching her, repeatedly said he would not do it again, and repeatedly said not to tell anyone. R.D. was arrested within an hour and subsequently charged with sexual abuse. R.J. told the social worker that in her native country girls kill themselves when this happens, she was afraid her mother would not believe her, and feared what her mother would do for "bringing shame to her family." The social worker, along with a police officer, then met with mother. After listening to the recorded pretext phone conversation, mother cried, said she did not know what to think, wondered why her daughter had never said anything, and stated her " 'family is ruined.' " Mother agreed not to allow any contact with R.D.

The following day, September 9, R.J. called the social worker. She complained her mother was angry and accusatory, and said she and her siblings had also witnessed numerous incidents of domestic violence against mother by R.D. and she did not feel safe in her home. The social worker obtained a protective custody warrant and detained R.J. the following day.

On the same day, September 10, the social worker met with S.J., R.J.'s brother who was then 14 years old. S.J. said he was aware R.D. was doing " 'bad things' " to his sister because he had seen him come into their bedroom at night and lay next to her. He could feel the bed move, but was too afraid to look and would shut his eyes tightly and try to go back to sleep. He was afraid to tell his mother. He denied he had been abused and said he felt safe in his home. He also admitted he has hit his sister, cannot control himself when he gets angry, and that his mother was beaten by her first husband. He did not see R.D. do anything inappropriate to S.D.

2

The social worker also called mother. Mother said she was at work and couldn't meet in person. She denied being angry or accusatory with R.J. and "did not [know] why the [social worker] was doing this."

The following day, September 11, the social worker met with mother. Mother again denied saying anything hurtful to R.J., but admitted being angry with her "because she is not supposed to have sex before marriage" and complained " '[s]he is ruined.' " Mother angrily asked the social worker, " 'What do you want from me?' " She wanted R.J. returned home to help care for S.D. When the social worker explained that mother needed to ensure R.J.'s safety, mother replied, " 'What do you want me to do, okay I will quit my job and school and you can support me.' " Mother stated she wanted to send her children to India, where she has supportive family that will help care for them. Mother denied any abuse by R.D., stated the children were confused by what they saw, and claimed she and R.D. " 'play' " fight. She admitted she had been abused by her first husband. She also admitted her son has anger problems and refused to discuss his behavior.

On the same day, the social worker met with S.D., who was then five years old. She denied any abuse by her parents. She said her brother slaps her and hits her with a belt, but not hard, and she is not afraid of him. She is scared, however, when her mother and R.D. fight and R.D. hits her mother. She said her mother told her R.D. (who had been arrested) was now living in India.

On September 15, the county filed juvenile dependency petitions on behalf of all three children. The petition filed on behalf of S.D. alleged the children had been exposed to domestic violence between mother and R.D. (failure to protect, Welf. & Inst. Code[1] § 300, subd. (b)(1)) and alleged sexual and emotional abuse of S.D.'s half sibling (abuse of sibling, § 300, subd. (j)(1)). Although the agency recommended only R.J. be removed from the home, the court ordered all three children removed. There was to be no visitation between mother and R.J., and supervised visitation with S.J. and S.D. Mother

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

3

was also required to surrender the children's passports, and make no mention of sending them to India.

### *The Initial Jurisdiction and Disposition Determinations (February 2010)*

On October 9, 2009, the agency filed its report for the jurisdiction hearing. The report discussed the sexual abuse of R.J. in detail. S.J. continued to deny any abuse and minimize his own anger problems. He was concerned his mother was lonely and believed she would probably benefit from counseling. S.D. missed her mother, was scared being alone, scared being in America, and wanted to go to India with her mother because "in America the police come."

As for the parents, mother denied any abuse by either her first husband or by R.D., and also denied S.J. ever hit his siblings. With respect to the sexual abuse of R.J., mother now repeatedly said " 'I don't know' " and complained her daughter had "never liked" R.D. She denied any abuse could have occurred while R.J. was in India because too many people lived in their house, and R.D. lived elsewhere. Asked about the pretext call, mother again said, " 'I don't know, what I heard that happened was mutual.' " She also admitted she told R.J. that if the abuse had been happening for as long as R.J. claimed, maybe she was " 'enjoying with him.' " R.D., at this point, was flatly denying any sexual abuse of R.J. and claiming " 'my wife is my proof.' " He also denied any physical abuse of mother. He did not understand why the children had been taken from her, and stated " '[i]t is not her fault.' " On November 20, the matter was rescheduled for an uncontested jurisdiction/disposition hearing on December 21.

On December 17, the agency filed its disposition report. By this time, a mental health assessment had been made of mother. The therapist reported mother was depressed and wanted her family returned. She denied to the therapist knowing anything about the sexual abuse of R.J. because her children never said anything, and denied such abuse occurred while the children were in India because they slept with mother's parents. Mother was more direct with the social worker and flatly said "she still did not believe the accusations [R.J.] was sexually abused by [R.D.]" because of R.J.'s "behavior when she was in the home of really disliking [R.D.] which leads her to believe that she would

4

make up stories in order to hurt him." When the social worker told mother continued denial of the abuse could well lead to placement of the children outside the home, mother repeated she did not believe R.J. The social worker had also followed up on a report of touching of S.D. on her buttocks and private parts. Two attempts to conduct a meaningful forensic interview failed because of the child's inability to focus or engage. When the social worker asked mother about this report, she thought the inquiry was ridiculous and believed any touching had to do with helping S.D. develop proper toilet habits, which in their family included washing the bottom. The social worker also asked mother about a telephone conversation with her son, S.J., which had prompted S.J. to call the social worker. S.J. reported his mother told him to " 'keep [his] mouth shut' " and not talk to the social worker. The disposition report concluded the three children should be made dependents of the court and reunification services be offered to mother.

On February 22, 2010, the agency filed an addendum to the disposition report discussing a psychological evaluation of S.D. The psychologist concluded " 'with a reasonable degree of professional certainty, substantial danger to [S.D.] does not exist at this time should mother and child be reunited.' There is insufficient evidence that shows [S.D.] has been sexually abused . . . ." (Italics omitted.) This "is of course assuming . . . [R.D.] is not returning to the home," and mother "expressed that she does not want [R.D.] to return to the home." The psychologist stated mother could benefit from ongoing individual psychotherapy, and had no mental disability that would preclude her from utilizing services. The social worker reported mother said she now wanted a legal separation and now believed R.J. had been sexually abused. Mother said she wanted to apologize to R.J., and repeatedly said she needed her children and her children were her life. Mother's therapist had reported mother had attended all sessions to date, expressed her love for her family and acknowledged her daughter had been sexually abused. The therapist stated that in sexual abuse cases the nonoffending parent often initially denies abuse has occurred. The social worker believed mother had made significant changes in terms of coming to terms with her daughter's abuse, and was sincere about making the changes necessary to care for her children. The social worker recommended that S.J. be

returned to mother and that out-of-home placement continue for R.J. and S.D., with continued visits with S.D. to transition her return to mother. On February 24, 2010, mother waived her rights and submitted as to jurisdiction, and based on the agency's reports, the court sustained the allegations of the petition and ordered reunification services.

*The Periodic Status Reports (August 2010 to March 2012)*

On August 2, 2010, the agency filed its six-month status report. The three children were doing well, R.J. and S.D. in out-of-home placements, and S.J. at home with mother. Mother was continuing in therapy, slowly coming to terms with what had happened to R.J. The social worker believed mother would need significant support to "assume the role of parent and integrate her culture with the culture that her children have grown up with so that she is able to protect them." R.D. remained in jail, awaiting trial. The court maintained R.J.'s out-of-home placement and returned S.D. to mother, and continued maintenance and reunification services.

On January 7, 2011, the agency filed its next six-month status report. The three children were continuing to do well. Mother was continuing in therapy. However, she also had taken actions to support R.D., who remained in jail awaiting trial. The social worker reported mother had received $50,000 from his family to pay for an attorney, had asked R.J. to recant her accusations, had allowed R.D. to call her at home, and again had a photo of R.D. by her bedside (which the agency had earlier asked her to remove). When asked whether she believed R.J. had been molested, mother answered, " 'I didn't see it.' " The therapist indicated it was likely to take a long time for mother to resolve cultural struggles and separate herself from traditional Hindu belief that a woman must "stand by her man." On January 11, the court dismissed the proceedings as to R.J., and on January 19 also terminated the proceedings as to S.J. The court continued the proceedings as to S.D., continued maintenance services, and continued its order that R.D. have no contact with S.D.

On July 7, 2011, the agency filed its next six-month status report. S.D. was continuing to do well, and the agency recommended the dependency proceedings be

terminated. However, S.D.'s court-appointed special advocate (CASA) requested S.D. remain a dependent of the court, stating concerns she appeared underweight, was not eating enough, and was refusing to take showers for up to two weeks at a time. The advocate believed S.D. was struggling with her situation, and was concerned the "recent verdict" in R.D.'s case would increase her stress. The court maintained the dependency proceeding as to S.D. and continued the matter for three months.

The agency filed a further report on October 18, 2011. The social worker investigated the CASA's concerns and concluded they were unfounded. S.D. was determined to be "in a safe environment," and the agency again recommended termination of the dependency proceeding. However, counsel for S.D. opposed the recommendation, stating continuing concerns that mother needed further help with discipline issues, particularly in light of several recent incidents, and further therapy to better come to terms with the molestation of R.J.: "[T]here have been no assurances . . . that the mother is supportive of [R.J.], believes the molestation occurred, and would protect [S.D.] from her father upon his release." The court again continued the dependency proceeding as to S.D. and continued family maintenance services.

On March 29, 2012, the agency filed its next six-month status report. The family was availing itself of the services provided, and S.D. was continuing to do well. However, the social worker was concerned S.D. was facing increasing tension between the Indian cultural norms and beliefs of her mother and maternal grandparents who were residing with the family, and the American culture to which she was otherwise exposed. S.D. was also more attuned to the tension in the family resulting from her sister's molestation. The agency recommended the dependency continue "[d]ue to the fact that [S.D.] is not at an age where she could implement a safety plan if the mother was [to] have contact with [R.D.]." At the time, R.D. was in San Quentin. The court continued the dependency proceeding and maintenance services.

***Second Round of Dependency Petitions Triggered by R.D.'s Early Release From Prison (May 2012 to October 2012)***

Just over a month later, on May 3, 2012, the agency sought an order allowing unannounced visits to the home because R.D. had been "released from prison unexpectedly." Although a no-contact order was in place, given mother's expressed doubts that R.J. had ever been molested, the agency wanted to make visits to help ensure mother precluded contact of S.D. by R.D. The court issued the requested order and on August 2, 9 and 31 issued restraining orders prohibiting R.D. from having any contact with S.D.

On September 6, the county filed a subsequent dependency petition on behalf of S.D. in the wake of S.J.'s disclosure that R.D. had not only sexually abused his sister, but had also sexually abused him, beginning in about 2006 when he was 11 years old. He told social services R.D. had threatened him not to tell anyone, and he never did because he knew his mother would not believe him, just as she had not believed his sister, R.J. He also said mother had maintained contact with R.D., and he feared she would not protect him. The subsequent petition alleged failure to protect (§ 300, subd. (b)(1)) and abuse of a sibling (§ 300, subd. (j)(1)-(3)). A separate dependency proceeding was instituted on behalf of S.J.

In its detention report filed the same day, the agency reported S.J. had disclosed that R.D. continuously abused him during 2006 and 2007, until R.D. was arrested for molesting R.J. The agency also said it had received notice of S.J.'s accusations against R.D. in April (before seeking the visitation and restraining orders) and had spoken with mother about it. She repeated what she had frequently said about R.J.'s molestation, that she had never seen anything, S.J. had never said anything to her, and " 'therefore I don't know if the abuse happened.' " At the August 2 detention hearing in the new dependency proceedings on behalf of S.J., however, mother flatly testified she did not believe R.D. ever abused either of her children and she would welcome him back if no restraining order was in place. Mother repeated that she did not believe her children when the social worker spoke to her on September 5. She also disclosed she had been speaking twice a

8

week with R.D., but claimed she would not allow R.D. into the house while a protective order was in place. The detention report stated R.D. had been released from San Quentin approximately six months earlier "as the charges were dropped due to an issue of his Miranda Rights."[2] R.D. told the social worker he had not seen S.D. and would not, given the restraining orders. The social worker concluded that mother's refusal to believe her children and her continued contact with R.D. placed S.D. in danger of sexual abuse by R.D. and requested that S.D. again be removed from mother. The social worker also reported that when he met with S.D. she refused to talk to him and burst into tears.

At the detention hearing the following day, September 7, mother asked to continue the matter for a contested hearing and opposed the agency's request for immediate removal of S.D. On confirmation by the agency that a restraining order was in place and it had no evidence R.D. had violated it, the court concluded the issue of custody could "go another three days or so" and denied immediate removal and continued the hearing.

The agency filed an addendum to its detention report on September 11, 2012, stating S.D. had told her half sister, R.J., that mother had said both R.J. and S.J. were " 'bad people.' " S.D. similarly told her CASA that her half sister and brother were not welcome in the home and her mother " 'does not like' " them. The social worker summarized that S.D., then eight years old, was "in the middle of both a cultural conflict as well as torn between her love for her mother who continues to make negative comments about her siblings and is in denial about the sexual abuse they both experienced." The social worker shared the CASA's concern about the ability of mother to protect S.D.

---

[2] In subsequent reports, the agency stated R.D. was released from prison following a successful appeal. At the jurisdiction/disposition hearing on October 3, counsel for R.D. corrected the statements in the reports. He stated R.D. was released after the superior court granted a petition for *corum nobis*, charges were refiled, and the matter was resolved in the midst of trial by way of a negotiated disposition, pursuant to which R.D. pleaded no contest to two non-molestation felony charges and admitted a serious felony enhancement. As a result, R.D. was not required to register as a sex offender, received credit for time he had already served, and was out on parole.

At the continued detention hearing on September 12, the agency moved its report and addendum into evidence without objection. The social worker who had been working with the family for "approximately three years" testified. He confirmed restraining orders were in place and he was not aware of any violation by R.D. He explained the agency decided it needed to do more after he read the transcripts from the August 2 jurisdictional hearing in S.J.'s case and spoke with the siblings. When asked whether a protective order was adequate, he replied: "I'm concerned about [mother's] ability to enforce the restraining order, especially based on her testimony. I know eventually she said she would call the police, or the jail, in her terms, but I'm not convinced of that." He was not convinced because she does not believe R.D. has ever molested her children, she continues to have contact with him, she relies on him for certain basic needs, and she testified at R.J.'s jurisdictional hearing she would rather die than divorce him. He also believed mother's disbelief and denigration of her two older children were having a discernible negative effect on S.D., noting her stealing and hoarding at school, and her comments to her siblings about how torn she was. He also noted S.D.'s new fear in meeting with him, when she had refused to talk to him, hid under the table, and burst into tears—behavior she had never before displayed.

In summing up the agency's position, counsel stated the events that unfolded at the jurisdictional/dispositional hearing for S.J., after 18 months of services for mother, was the "straw that broke the camel's back." Mother "still adamantly, adamantly denies any of the allegations that her two prior children have made. She accused them of being liars. . . . She denied knowing even why her husband was in custody. She—she adamantly stated she would never divorce him. Admitted still having contact with him." The agency concluded it did not, and could not, believe mother would enforce the protective order if R.D. appeared and maintained that that, along with the emotional damage mother is inflicting on S.D. by her aspersion of her older children, supported a removal order.

The court agreed with the agency's assessment of the situation: "First of all, although [S.J.] had been allegedly repeatedly molested in the home of mother and father

10

for years, that did not come to light until recently . . . . [¶] And we do have the testimony of mother, who testified in August that she still doesn't believe that what he said was true.[3] And in fact, believes that he was making it up so that he could go live somewhere else . . . . [¶] And the strength of her denial and her complete clinging to this idea that everything her children are saying cannot be true . . . . [¶] And that view of what happened, the serious abuse that happened with the children, suggests that the mother would continue to be in denial should anything like that happen with respect to [S.D.] . . . . [¶] [T]he court's concern is what if [R.D.] decides to come home. And then something—either he violates the restraining order or something happens. I really don't feel confident that the mother would be able to report it or to acknowledge that it happened. [¶] I think that the same denial or defensive mechanisms that she's utilizing would be in effect, would come back. So I think that does create a risk and I'm concerned. [¶] I'm concerned that it is now changing and it's escalating. . . . And I am drawing a reasonable inference from that, that she would not be able to protect [S.D.] . . . ." Other measures, like the restraining order, only work if "the person at home can protect or will protect the child." But, the court did not think mother can or would do that, "given her current state of mind." The court ordered S.D. removed from mother's custody, finding substantial danger to her and no reasonable means to protect her physical and emotional health without removal.

The agency filed a jurisdiction report on October 1. Mother now denied saying she would welcome R.D. back and said she was planning to separate from him and return to India to obtain a divorce. With respect to the molestation of R.J. and S.J., she continued to say, " 'I don't know, I have never seen this before' " and " 'If I don't see the abuse how do I know whether it is true.' " She asserted S.D. was in no danger, and she had brought her parents over from India to take care of S.D. day and night. She admitted contacting R.D., but only to discuss their separation. R.D., in turn, told the social worker mother did not want him anymore and that was why they were planning to separate. He

---

[3] The court had presided over that jurisdictional hearing and heard mother testify.

11

maintained there was no parole condition preventing him from having contact with her, and asserted he did not want any trouble and would follow " 'the rules.' " As for the allegation of sexual abuse of S.J., he claimed that had " 'already [been] brought up' " in court and he did " 'not understand why it is being brought up again.' " During a conversation on September 26, R.D. "adamantly denied" he ever harmed R.J. and S.J., stating he has been " 'freed' " and " 'if all this really occurred I would still be in prison.' "

The agency believed reasonable efforts had been made to prevent the need to remove S.D., but they had not been effective. It also was not recommending reunification services pursuant to section 361.5, subdivision (b)(10), based on mother's failure to reunify with R.J. The agency noted mother had also been denied reunification services as to S.J., and his dependency case had already been set for a section 366.26 hearing. It again noted that at the August 2 jurisdictional hearing for S.J., mother stated she did not believe her children were the victims of sexual abuse—" 'I never see it' "— and testified she would rather die than divorce R.D. As to S.D., the agency intended to pursue an alternative permanent placement plan, and to refer her to the adoption unit. The agency requested S.D. be removed from mother's custody, reunification services be denied, and the matter be set for a 366.26 hearing.

At the October 3 jurisdiction/disposition hearing, the agency moved both its detention and jurisdiction reports into evidence without objection. (Mother executed a waiver of rights form and submitted as to jurisdiction, objecting only to the allegation she had testified at S.J.'s jurisdictional hearing that she would welcome R.D. back into the home. The court then clarified its recollection of mother's testimony, that she initially testified she would welcome R.D. back but then stated she would abide by any restraining order. After ensuring mother understood the consequences of her waiver, and on the basis of the agency's reports, the court sustained the allegations of the subsequent petition. The agency then modified its dispositional recommendation, pursuant to agreement of all parties, to request reunification services for mother. Mother did not submit, however, on placement, stating she intended to appeal the removal order made at

12

the prior detention hearing. The court ordered reunification services for mother and, finding clear and convincing evidence of substantial danger to S.D., continued out-of-home custody.

A month after the jurisdiction/disposition hearing, counsel for S.D. requested the court make clear that its order allowing visitation with S.D.'s half sister and half brother allowed for overnight visitation. The form application required counsel to set forth the position of all parties. Counsel indicated mother objected, and explained that mother's counsel had stated mother does not believe her older children were molested and believes contact with them should not occur. The social workers for S.D. and S.J., however, believed regular visitation was in the children's best interests. The court approved the requested clarification on sibling visitation.

On November 26, mother filed a notice of appeal as to the "10/3/2012" jurisdiction and removal orders, and the "9/8/2012" detention order.[4] However, in her opening brief, mother challenges only the removal order.

## II. DISCUSSION

Section 361, subdivision (c)(1), provides in relevant part: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent or

---

[4] As we have recounted, no removal order was issued at the September 7 detention hearing (no hearing was held on the 8th). Rather, the detention removal order was made on September 12. Further findings continuing out-of-home custody were made in connection with the October 3 jurisdiction/disposition hearing.

13

guardian with whom the minor resided at the time of injury. The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home. The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1).)

" 'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citations.] (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136 . . . , disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6 . . . .) The juvenile court's findings must be based on clear and convincing evidence. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 696 . . . ; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1656 . . . .) We review an order removing a child from parental custody for substantial evidence in a light most favorable to the juvenile court findings. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1120 . . . ; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193 . . . .)" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

As we observed at the outset, mother frames the issue as whether her denial that her daughter and son were molested by her husband (their stepfather) is a sufficient basis to remove her younger daughter from her custody, given her stated willingness to abide by a protective order. As we have recounted at length above, however, the circumstances in this case are much more complex than mother suggests, and the record before the court supports the removal order.

To begin with, the molestation in this family was egregious. R.D. continuously molested mother's older daughter and son for more than two years, and the abuse stopped only because R.J. finally reported it and R.D. was arrested. Thus, there can be no question that there was a basis for the court to assume jurisdiction over S.D. (*In re I.J.*

14

(2013) 56 Cal.4th 766 [father's three years of egregious sexual abuse of older daughter sufficient basis to assume jurisdiction over all younger children, including two sons].)

Mother's conduct has only exacerbated the damage to her children. When her daughter disclosed the abuse, mother refused to believe it—despite the fact the transcript of the pretext call to R.D. makes it clear sexual abuse had been occurring. Mother then adopted the mantra she "didn't know" whether the abuse had occurred because she "never saw" it. Midway through the proceedings, she professed to acknowledge R.J. had been abused and claimed she wanted to apologize to her. But, when her son disclosed— in the wake of R.D.'s convictions being set aside and unexpected release from San Quentin—he had also been a victim, mother reversed course. She now claims both children are lying and no abuse has ever occurred. Furthermore, not only does mother not believe her older children, she has essentially disowned them and gone out of her way to disparage them to S.D. This conduct raises significant concern mother cannot and would not protect her younger daughter from the same sexually predatory conduct.

Nor is that all that the record reveals. Mother's statements and conduct with regard to her husband, R.D., only heighten concern for S.D.'s safety. Mother told her older daughter R.J. to recant, she channeled money for R.D.'s defense, she put a photograph of R.D. back in place by her bedside, and she has stayed in communication with him twice a week since he was released from prison. During the jurisdictional hearing in S.J.'s second dependency case—only a month before the detention hearing on the subsequent dependency petition on behalf of S.D.—mother declared she would rather die than divorce R.D. Yet, she then turned around and told the social worker for S.D. she was going to separate from R.D. and would divorce him, although not until after his parole and the two could return to India. R.D., in turn, while saying he would abide "by the rules," declared no parole condition prevented contact with mother. And he has now proclaimed he never molested either child—if he had, he would "still be in prison." All of this raises grave doubt there has been any change in the relative positions of power (and powerlessness) in this family that allowed the egregious abuse as to R.J. and S.J. to occur in the first place, raising serious concern that mother cannot and would not ensure

15

compliance with protective orders.  The court simply did not believe mother's assertion she would ensure compliance with any protective order, a credibility determination solidly grounded on the record.  The court reasonably concluded mother was unlikely to exclude R.D. from the home if he wanted entry, or to report any violation of a protective order, a conclusion also amply grounded on the record.

While dependency law strives to preserve the family unit, its overriding concern is to ensure the safety, protection, and physical and emotional well-being of children who are at risk.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 1263.)  The dependency court did not err in this case in ordering S.D. removed from her mother's custody.

### III.  DISPOSITION

The jurisdictional order removing S.D. from mother's custody is affirmed.


_____
Banke, J.


We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.